ELLIS, Judge.
This is an appeal by Royal American Life Insurance Company from a judgment condemning it, solidarily with Mauroner-Craddock, Inc., J. B. Mauroner and Richard Craddock, to pay to plaintiffs William D’Aubin and Edna Lucille Lovett D’Aubin the sum of $7,542.40 plus interest and costs. No appeal has been taken by the other defendants cast in judgment, and the judgment is iinal as to them.
*399 Plaintiffs entered into a building contract with Mauroner-Craddock, Inc. on November 17, 1965. Under its terms, the contractor was to build a house for plaintiff on a five acre tract of land owned by them, for a total price of $29,575.00. On the same date, a construction loan agreement was executed by plaintiffs, Mauroner-Craddock, Inc. and Royal American. Under the terms thereof, Royal American agreed to lend plaintiffs $31,900.00, which was to be payable in five stages. The first advance of $9,600.00 was to be used to pay off the existing mortgage on the five acre tract. The next three payments were to be made at various stages of construction, and the final payment on completion and acceptance of the house.
The agreement further provides that Royal American is to receive a commitment fee of $638.00, and contains an authorization from plaintiffs to Royal American to make all stage payments directly to the contractor.
On the same day, Mr. D’Aubin executed a hand note for $9,600.00. On November 22, 1965, he executed a second hand note for $4,460.00, the amount of the second stage payment, which was due when the slab was poured.
On December 6, 1965, Royal American issued its check to the law firm of Mc-Collister, Belcher, McCleary and Fazio, which was handling the construction loan, and which represented both Mauroner-Craddock, Inc. and Royal American. The check was deposited in the law firm’s client’s account, and the proceeds thereof distributed as follows:
1. To Louisiana Companies, to pay off the existing mortgage of the five acre tract, plus interest and penalties. $10,-543.59
2. To Royal American, for its commitment fee. $638.00
3. To Mauroner-Craddock, Inc. $3,-059.76
These checks total $14,241.35, or $181.35 in execss of the amount received from Royal American.
On January 12, 1966, Mr. D’Aubin executed a third hand note for $6,690.00, the amount of the third payment, due when the house was framed up. On the same day, Royal American executed a check to Mauroner-Craddock, Inc. for $6,682.50, having deducted $7.50 for an inspection fee. This check was deposited in the Mauroner-Craddock, Inc. construction account.
On February 18, 1966, Mr. D’Aubin executed a fourth hand note for $6,690.00, the amount of the fourth payment, due when the house was “blocked in”. On the same day, Royal American executed its check in the same amount to the contractor, which was deposited in the construction account.
Thereafter, Mauroner-Craddock, Inc. defaulted on the job, and liens totalling $7,542.00 were filed against the D’Aubin property. Plaintiffs were forced to refinance in order to pay off the liens and complete the construction of the house. In the process, Royal American was paid the money due it, without ever having made the final advance.
At some time during the foregoing period, Mauroner-Craddock, Inc. got into financial difficulties. Rolfe McCollister, senior partner in the firm of McCollister, Belcher, McCleary and Fazio, arranged to have Ronald Stephens, an employee of several corporations controlled by McCol-lister, countersign all checks issued out of the Mauroner-Craddock, Inc. construction account. Mr. McCollister was also Chairman of the Board of Directors of Royal American, and Mr. Stephens had some connection with Royal American, although not paid by them.
Mr. Stephens testified that he rendered this service as a favor to Mr. McCollister. He said his instructions were to see that Mr. Craddock and Mr. Mauroner did not *400 withdraw excessive personal funds. He further testified that he was requested by McCollister to “make sure that it went to suppliers, labor or some particular thing, but as far as controlling the — specifically where it went and what it went to in pertaining to a job or a particular thing I wouldn’t — I had no records bookkeeping-wise or anything like this”. He also said that he checked with Mr. McCollister when in doubt about any check presented to him.
Rolfe McCollister testified that he suggested the countersigning arrangement to Mauroner-Craddock, Inc. to assist them in getting their business organized. He testified that the contractors had five or six jobs going at that time, and that the sole source of funds for the construction account was advances made during the interim financing of these jobs. He testified that Mauroner-Craddock, Inc. was operating from pay day to pay day and from draw to draw, and that they got behind on their account with a lumber company. He said he endorsed their note at the lumber company, and that his law firm advanced them funds several times. In the latter connection, he testified as follows:
“The law firm advanced them funds several times. When there would be a draw maybe due on the following Wednesday or Thursday and they would have a payroll come due, I think they paid every Friday, sometimes in order to keep their men from walking off we would go ahead and advance them two or three or four thousand dollars which they would pay us out of the draw the following week. It would be a loan for four or five days. I don’t think for any extended period of time. It was just from a payroll that they had to make to the time of the draw which was probably in a few days.”
In resolving the question of Royal American’s liability to plaintiffs, the trial court said, in its' written opinion:
“The evidence in this case shows beyond a shadow of a doubt that after Mauroner-Craddock began having financial difficulties Rolfe McCollister, as an officer of Royal American Life Insurance Company, became directly concerned and involved with the cash flow of interim financing funds to and from the contractor. While the Court can well appreciate this involvement inasmuch as McCollister was making personal advances to the contractor to help maintain its operation, nevertheless the use of these interim financing funds for these purposes was not proper under the law.
“Ronald Stephens, an employee of Mc-Collister, and who had the authority to co-sign checks for the contractor, testified that he personally “watch-dogged” the account and that McCollister passed on payment of debts of the contractor. McCollister himself acknowledged that he acted as an overseer on the Mauroner-Craddock account and that the source of funds in the construction account was from interim financing supplied by Royal American. It is evident from this testimony, as well as that of Mauroner and Craddock, that McCollister, as the leading officer of the lending institution for D’Aubin’s loan effectively controlled and directed the payment of obligations from the construction account of the contractor. His action in this regard was aided and assisted by both J. B. Mauroner and Richard Craddock.
“Without detailing payments from the construction account to pay other debts, suffice it to say that the repayment of two loans totalling Seven Thousand Dollars ($7,000.00) to the law firm of Mc-Collister, evidenced by two checks (Plaintiffs’ Exhibits 1 and 2), are sufficient to indicate the diversion of funds from the account to pay albeit legal debts of the contractor, but, of course, not those to be honored ahead of those labor and ma-terialmen’s claims arising out of the construction of D’Aubin’s improvements.
*401 These payments alone were nearly equivalent to the liens which accrued against the D’Aubin residence.”
In brief, plaintiffs claim that Royal American’s liability to them arises out of the breach of a fiduciary duty, first in the misapplication of interim financing funds, and second in the failure to inform plaintiffs of the precarious financial situation of the contractor.
In the case of Bollinger v. Livingston State Bank & Trust Co., 187 So.2d 784 (La.App. 1 Cir. 1966), we said:
“It is elementary that in order to recover damages in this case plaintiff bears the burden of pointing out a contractural or fiduciary duty on the part of the defendant, of proving a breach of that duty, of showing that the breach of duty complained of was a proximate cause of the injury, and that the injury actually was suffered and is compensable. In disposing of this case it will be helpful to relate the arguments of both sides to the broad framework.
“ * * * Unquestionably, the bank owed plaintiff a duty in this case. The legal relations existing between plaintiff and the bank were created by the delivery of the collateral mortgage note and building contract to the bank and by the bank’s undertaking to advance money and supervise construction as to quality and quantity as the agent of plaintiff. The duty which the bank owed to plaintiff was that of a fiduciary and agent, for this is the nature of the relationship created between them.”
In this case, the written agreement between the partners required Royal American to make the stage payments as set forth therein. The obligation of ascertaining, through inspection, the propriety of making these payments was impliedly and factually assumed by Royal American, and the record does not indicate that they failed in this duty, it being the burden of the plaintiff to prove such a failure.
Plaintiffs complain that the first stage payment of $4,460.00 was made, not to the contractor, but to the law firm as part of the check for $14,060.00. It is pointed out that part of that payment was actually used to pay off plaintiff’s mortgage on the five acre tract, since the amount necessary exceeded the $9,600.00 allotted for same by $943.69. Of course, it cannot be denied that the shortage was due to money owed by plaintiffs, and the payment made to Louisiana Companies was made for their benefit. If the first mortgage hadn’t been paid off, no interim finance funds would have been forthcoming from Royal American. We do not believe that plaintiffs can complain now. The obligation to make up the shortage should have been theirs and not Royal American’s.
Neither do we find that the repayment of $7,000.00 to the law firm out of the construction account constitutes a misapplication of funds. It is not pretended that the construction account was a dedicated fund, or that the money was not due to the law firm. Even if it be assumed that the obligation assumed by Mr. Stephens can be imputed to Royal American, it does not follow that any duty, fidiciary or otherwise, has been breached. Stephens’ job was not to oversee the entire operation of Mauroner-Craddock, Inc. He did not have their books, or keep the checkbook, or attempt to see if the individual owners’ money was kept separate. His job was to be sure that the money coming in was used to pay legitimate business debts and that Mauroner-Craddock did not make excessive withdrawals for their personal account. We cannot find where he failed in this duty.
We find that the knowledge of Mauroner-Craddock’s shaky financial condition must be imputed to Royal American, as well as knowledge of the arrangement relative to the construction account. The fact that the Chairman of their Board of Directors, their law firm and a sometime *402 employee had this knowledge is sufficient for that purpose. We do not believe that there was a duty on its part to communicate this information to plaintiffs. During the time that the stage payments were made, there is no indication that the contractors were not keeping up with their obligations. No liens were filed until late in June, four months after the last payment was made by Royal American. It was about that time that Royal American contacted plaintiffs about the default of the contractors.
We are of the opinion that Royal American fulfilled whatever fiduciary duty it owed to plaintiffs, and that the judgment against it was improvidently rendered.
The judgment is therefore reversed insofar as it affects Royal American, and there will be judgment herein in favor of Royal American Life Insurance Company and against plaintiffs, dismissing plaintiffs’ suit at their cost. The judgment is, of course, final as to the other defendants cast.
Reversed and rendered.