TATE, Justice.
This suit arises from a construction loan agreement. Under its terms the lender (Royal American) agreed to advance $31,900 to the borrower-owner (William D’Aubin) for the construction of a residence on his property by the contractor (Mauroner-Craddock, Inc.). However, the money advanced to the contractor was not used by it to pay off construction debts, so that the owner was forced to pay off liens exceeding seven thousand dollars against his property.[1]
By the present suit, the owner D’Aubin and his wife sue to recover for the diversion from their construction loan of sums used for other purposes. These included paying unsecured debts due to the law firm of the chairman (Rolfe McCollister) of the board of directors of Royal American. The plaintiffs D’Aubin recovered judgment in the trial court against the contractor (Mauroner-Craddock) and its officers indi *353 vidually (Mauroner and Craddock), who did not appeal the trial court judgment.[2]
The plaintiffs further recovered judgment against Royal American, the lender, which appealed. The court of appeal reversed the judgment insofar as against Royal American, holding that it breached no fiduciary duty to the plaintiffs, 251 So.2d 398, La.App. 1 Cir. (1971). We granted certiorari, 259 La. 875, 253 So.2d 213 (1971), because we entertained some doubt as to this conclusion.
The construction loan agreement was a three-party instrument executed between D’Aubin (the owner and borrower), Mauroner-Craddock, Inc. (the contractor), and Royal American (the lender). Royal American’s obligation was to advance the loan in five stages.[3] These payments were to be made directly to the contractor at each stage. No serious contention is made of any default in this obligation.
The agreement further provides that the purpose of the loan is to enable to pay the borrower’s expenses in connection with his acquisition and construction of a residence on described land, “free and clear of any liens, claims or encumbrances.” It continues : “It is expressly understood and agreed that all funds advanced in connection with the terms of this agreement shall be used to pay actual expenses in connection” therewith. Clause 5 of the agreement. “Borrower [D’Aubin] acknowledges that all sums loaned by Mortgagee [Royal American] are borrowed for the sole purpose of providing interim financing for the residence * * Clause 7.
Construing the agreement as a whole, the obligation of Royal American under it was solely to pay the proceeds of the loan to the contractor in the agreed stages. While the contractor Mauroner-Craddock and the owner D’Aubin were obligated to use the proceeds solely for construction on and acquisition of the site described, Royal American was not under the agreement itself obligated to assure itself that Mauroner-Craddock utilized the D’Aubin loan proceeds solely for the D’Aubin construction,[4] *355 nor do we understand the plaintiff D’Au-bin so to argue.
The plaintiff D’Aubin contends that Royal American is liable on an additional basis.
Shortly after construction of the D’Aubin home commenced, Mauroner-Craddock fell into financial difficulties and commenced defaulting in payment of its suppliers.[5] Following this, D’Aubin contends, Royal American through its officer, Rolfe McCollister, assumed control for Mauroner-Craddock of the flow of and payment from the construction firm’s interim financing proceeds, and Royal American permitted diversion of $7,000 of these funds to pay an unsecured debt due Mc-Collister’s law firm.
From this, D’Aubin persuasively argues that Royal American should be liable to him for the diversion of the loan proceeds from the Mauroner-Craddock construction account to purposes other than payment of the construction costs of his home, because: (1) the knowing diversion by Royal American’s agent of such proceeds breached the fiduciary responsibility so assumed by Royal American (for under the agreement such proceeds were to be used solely for the D’Aubin home), cf., Bollinger v. Livingston Bank and Trust Co., 187 So.2d 784 (La.App. 1 Cir., 1966) ; and (2) at any rate, the fiduciary responsibility of Royal American as agent for D’Aubin in paying his loan proceeds to Mauroner-Craddock required it, before continuing to make the payments, to inform D’Aubin of Mauroner-Craddock’s failing circumstances and of the likelihood that his monies would be diverted to payment of debts for purposes other than as agreed.
The argument of Royal American’s presumed knowledge and control rests solely upon the actual knowledge and control of Mauroner-Craddock’s affairs exercised by Rolfe McCollister and his agent, Ronald Stephens. If they were acting on behalf of Royal American, then indeed there is a substantial basis for D’Aubin’s argument that Royal American (as well as Mauroner-Craddock) is liable to him for the diversion by Mauroner-Craddock of the D’Aubin loan proceeds to other purposes, such as the payment of debts due to Mc-Collister’s law firm.
*357 The factual basis for imputing Mc-Collister’s knowledge and control to Royal American is as follows :
McCollister is chairman of Royal American’s board of directors. McCollister is senior partner of the law firm which represents Royal American. That law firm (although not McCollister himself) drew up the construction loan agreement for Royal American, Mauroner-Craddock, and D’Aubin.
McCollister, additionally, closely associated himself with Mauroner-Craddock’s affairs. Although he owned no interest in the construction firm (it was a client of his law firm), he personally guaranteed some of its debts as it was failing. Further, in an attempt to save Mauroner-Craddock, he assumed a “watch-dog” control over its “construction account,” into which the proceeds of its several interim financing agreements were deposited. (Not all of these agreements were with Royal American.)
The supervision of this “construction account” was exercised through Ronald Stephens. Stephens testified that he was on the pay-roll of several corporations (but not Royal American) in which McCollister was financially interested, and that he had offices across the hall from McCollister’s law office. McCollister, whom the records show to be not only a prominent attorney but also a businessman with substantial interests, characterized Stephens as his executive assistant. Under McCollister’s instructions, Stephens co-signed all checks paid from the construction account; none were supposed to be paid, except for construction costs of the several jobs on which Mauroner-Craddock was engaged — Ste~ phens’ primary purpose was to avoid draining from the construction firm’s operating account any personal expenses or withdrawals by its officers.
In connection with this assistance to Mauroner-Craddock, McCollister’s law firm on several occasions advanced (without interest) temporary loans of three or four thousand dollars. These advances were made for Mauroner-Craddock to meet its payrolls, and they were made with the understanding that they would be repaid within the next four or five days from the next “draw” the construction firm received from one of its interim financing agreements.
In this connection, a repayment of $4,000 was made on Monday, February 21, to the McCollister law firm, after a draw of $6,690 from the D’Aubin loan on Friday, February 18th. More probably than not, D’Aubin loan proceeds were used to repay the McCollister law firm on this occasion. The record sheds no light on when the McCollister temporary loan thus repaid had been made to Mauroner-Craddock, nor *359 if it was used to pay off workmen on the D’Aubin project.[6]
D’Aubin testified that, when progress on his home fell behind, he first attempted to get one of McCollister’s partners to represent him; the partner refused, saying their firm was retained by the contractor. He then saw Stephens, whom he knew from an earlier employment relationship. He testified that Stephens assured him that he would take care of the money. D’Aubin’s wife testified she called Stephens and received a similar assurance. Stephens recalled that one or both had called him about another matter, but he claimed he did not remember the conversation, which had occurred five years before trial.
Under all of these circumstances, if McCollister or Stephens were representing Royal American in the supervision of the Mauroner-Craddock construction account, then Royal American is chargeable with the breach of any duty to D’Aubin owed by these representatives. Our difficulty lies in finding that McCollister or Stephens were acting for Royal American.
For instance, the argument assumes that both Royal American and the three firms Stephens was being paid by, as well as the McCollister law firm, formed one interrelated economic entity dominated by Mc-Collister. The record before us, however, shows only that the firms had offices in the same building, that McCollister had an interest in some of them, and that some of the directors were the same. The record shows only that McCollister himself served on only Royal American’s board.
Again, although McCollister is- shown to be the chairman of the board of Royal American, his testimony stands uncontradicted that he occupied no administrative position with the company but only presided over meetings of the board of directors. Fie is not shown to be its dominant figure, so that notice to him is in effect notice to the corporation. 3 Fletcher on Corporations, Section 809 (1965).
Also, McCollister’s law firm was legal counsel for the company. By the record, his law firm’s sole connection with the instant transaction was to draw up the construction contract between Mauroner-Craddoclc and D’Aubin, and to draw up the construction loan agreement between these two and Mauroner-Craddock. His law firm also loaned Mauroner-Craddock money from time to time in an unsuccessful attempt to keep the construction, firm from failing. It is not shown that the law firm *361 was acting for Royal American in other than drafting the loan agreement.
McCollister himself is shown to have no connection with the administration of the present construction loan agreement. After the loan proceeds were deposited in the Mauroner-Craddock construction account, he and his agent Stephens did supervise withdrawals in order to prevent misuse of the funds for non-construction purposes. (McCollister had guaranteed some debts of Mauroner-Craddock.) Their testimony that the checks to the McCollister law firm were repayment of temporary three-day loans necessary for Mauroner-Craddock to meet its Friday payroll is not shown to be incorrect. So far as the record shows, they were acting for Mauroner-Craddock and McCollister pei-sonally, not for Royal American.
•There is thus no proof that McCollister and his agent Stephens were acting for Royal American in their supervision of the Mauroner-Craddock constrxxction account. McCollister explains his interest as motivated by concern for clients of his law firm and personal friends, as well as to protect his personal liability on a note he had endorsed for Mauroner-Craddock.
Initially, we felt that knowledge and acts of McCollister, chairman of Royal American’s board, should be charged to the corporation he directed. Nevertheless, the Tetord is devoid of any evidence that Mc-’Gollistcr has direction or conli'ol of Royal American or, on its behalf, of the present construction loan agreement or construction contact. •:
The general rule is that the private acts and knowledge of a chairman or a member of the board of directors of a corporation are not imputable to it, except with respect to matters within their general authority to act for the corporation or when they are indeed acting for the corporation. Mercier v. Canonge, 8 La.Ann. 37 (1853); Louisiana State Bank v. Senecal, 13 La. 525 (1839); 3 Fletcher on Corporations, Section 908 (1965). Under this principle, Royal American cannot be charged with McCollister’s ktxowledge acquired or acts done in his private capacity unrelated to his fmiction as chairman of Royal American’s board.
Similarly, Stephens is not shown to have been employed by or to have been acting for Royal American. He did recall an advertisement concerning lots for sale in the Tara subdivision. The advertisement stated “Developed by Royal American, for information call Ronald Stephens”, listing his (not Royal American’s) telephone number. He explained he was working for the Great . South. company, which paid for .the ad,, in an- arrangement whereby Great South referred to Royal American (developing Tara II) any prospects for lots in Great South’s Tara T which the latter- company- could not-'-sell.
*363 This last evidence, like other vague hints in the testimony, is a tantalizing indication that the operations of Royal American and the other corporations in which McCollister was interested were not so entirely separate and non-interrelated as, from the record before us, we must conclude.
Our learned trial brother held that Mc-Collister was acting as chairman of Royal American in his supervision of the disbursements from the Mauroner-Craddock account. If so, the trial judge correctly concluded that Royal American should be charged with McCollister’s acts in permitting the proceeds from the D’Aixbin loan to be used for non-authorized pxwposes, in violation of the construction loan agreement. Nevertheless, within the limits of the record before us, we are unable to find that the plaintiff D’Aubin has proved by a preponderance of the evidence (i. e., more probably than not) such a relationship between Royal American and McCollister in the instant transaction.
The court of appeal therefore correctly dismissed the suit of the plaintiff D’Aubin and his wife against Royal American. We affirm its judgment, with the cost of review in this court to be assessed against the plaintiffs-appellees-relators.
Affirmed.
McCALEB, C. J., dissents.
HAMLIN, J., dissents, being of the opinion that the ruling of the trial judge is correct.
BARHAM, J., dissents.

. The contractor defaulted on completion of the home. The owner completed it through another contractor. ^

. The plaintiff had also sued individually Rolfe MeCollister, a chairman of Royal American and a senior partner in the law firm which handled the transactions, and Ronald Stephens, an employee of several corporations allegedly controlled by MeCollister. The suit against these individuals was dismissed upon exceptions of no cause of action, and no appeal was taken.

. Clause 6 of the agreement provides for payment as follows: $9,600 when the agreement was signed, “to pay off the present mortgage on the property”; $4,-460, “when the slab for the foundation is poured”; $6,690, “when the house is framed up”; $6,690, “when the house is ‘blacked’ in”; $4,460, “when the house is completed and accepted by the owner”. All of these stage payments except the last were made as agreed upon; the last was not made, since the house was not completed.

.The construction loan agreement was prepared by the MeCollister law firm, which the evidence shows represented gen *355 erally both Royal American anti Mauroner-Craddock. Since we do not find the agreement ambiguous as to Royal American’s (non-) obligation with regard to the loan proceeds after they were turned over to the contractor, we do not reach the issue against whom such ambiguity should be construed. Civil Code Article 1957.

. For instance it did not pay the $716.26 concrete bill of Louisiana Ready-Mix, incurred for laying the foundation of the D’Aubin home, after which the second stage payment (see Footnote 3) became due some two weeks after the construction loan agreement was executed.

. The other repayment of $3,000 to the McCollister law firm was made some 16 days after a previous draw from the D’Aubin loan. Given the hand-to-mouth character of the Mauroner-Craddock aecount, with payments of overdue accounts being made immediately after deposits, it is unlikely that any D’Aubin proceeds were used to repay McCollister on this earlier occasion.